UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GEMOLOGICAL INSTITUTE OF AMERICA, INC,

       **Plaintiff,**

    - against -

ZARIAN CO., LTD., et al.,

       **Defendants.**

**OPINION & ORDER**

**03 Civ. 4119 (RLE)**

---

**RONALD L. ELLIS, United States Magistrate Judge:**

## I. INTRODUCTION

Plaintiff, Gemological Institute of America, Inc. ("GIA"), a corporation engaged in the business of analyzing and grading diamonds and gemstones, initiated this interpleader action on June 5, 2003, to resolve the ownership of a diamond it was holding. Defendants Zarian Co., Ltd. ("Zarian") and Siyance Brothers' Diamond Corp. ("S.B.") both claim rightful ownership of the diamond. On September 16, 2003, the parties consented to the trial of this matter before the undersigned, pursuant to 28 U.S.C. § 636(c).

Zarian moved for summary judgment on December 22, 2004, which the Court granted, in part, and denied, in part. *See* **Gemological Inst. of Am., Inc. v. Zarian Co., Ltd.**, 349 F. Supp. 2d 692 (S.D.N.Y. 2004). Familiarity with the facts outlined in that opinion and order is assumed herein. Upon summary judgment, the identity of the diamond at issue was not in dispute. The diamond is one which had been previously graded by the GIA, and previously owned by Zarian. GIA identified the diamond through its own internal grading reports and three gemologists' analyses. The Court found that the diamond had been stolen from Zarian's booth at an International Jewelry Fair in Dubai, United Arab Emirates, on May 16, 2001, and then came to

GIA's New York office on October 29, 2001, when S.B. submitted it for grading.

However, the Court found that material facts were in dispute as to whether, as S.B. alleged, it had bought the diamond in Israel and then sent it to New York, or whether, as Zarian alleged, the sale or transfer of the diamond had taken place in New York. The location of the transfer of possession of the diamond is critical to the Court's determination of ownership because, while in New York a purchaser of personal property cannot obtain title to stolen goods, in Israel, under certain circumstances, a good faith purchaser can obtain such title.

Following further discovery, a bench trial was held from June 12-13, 2006, and the parties submitted post-trial briefs shortly thereafter. For the reasons discussed below, the Court finds that, even if S.B. bought the diamond in Israel, S.B. has not met its burden to show that the purchase fulfills the requirements of the Israeli Sales Law for the transfer of title of stolen goods. Judgment is therefore entered for Zarian.

## II. BACKGROUND

S.B. was established by Benyamin Siyance ("Siyance") and his brother, Gabriel Siyance. Trial Transcript ("Tr.") at 80-81. The Siyance family has a history of engaging in the purchase and sale of diamonds, with locations in Israel, Italy, and New York. **Id**. at 16, 74, 79. In Israel, the Siyance family's business is called David Gems, after the Siyance brothers' father. **Id**. at 22. Michael Sianes ("Sianes"), another of the Siyance brothers, is located in Israel and has an office in the Ramat-Gan Diamond Exchange ("the Exchange"). **Id**. at 15, 26-27. Sianes has been a member of the Exchange for twelve years. **Id**. at 15.

According to the testimony at trial, the Siyance family meets a few times each year to discuss their business. **Id**. at 19-20, 89. Sianes and Siyance testified that the members of the

family share equally in the finances and the operation of the business. **Id**. at 18, 32, 37, 48. Sianes and Siyance also both testified that Sianes selects diamonds and buys them for the family business. **Id**. at 17, 20, 89. If Sianes deems a particular diamond appropriate for sale in New York, he sends it to S.B.'s office there. **Id**. at 19, 20, 89.

Sianes testified that on October 15, 2001, he bought an 11.57 carat diamond from Shemesh Zevulun ("Zevulun") in Sianes's office on the Exchange. **Id**. at 26-27. Zevulun is the Vice President of the Israeli Precious Stones and Diamonds Exchange. Zevulun Dep. at 20; Tr. at 24. The two men had regularly done business together for many years. Tr. at 23. Zevulun verified that he sold Sianes the diamond. Zevulun Dep. at 65-68. According to both men, in the morning on that day, Zevulun saw Sianes and told him he had a stone he thought he might be interested in. Tr. at 27; Zevulun Dep. at 65. Later, Zevulun came to Sianes's office with the stone. Tr. at 27-28. Sianes examined it, **id**. at 27, and after some negotiation, agreed to pay $370,000 for it. **Id**. at 28, 29, 59. Sianes exchanged the diamond for a *petek*, a note, which both men reported was later destroyed, as was the custom, once their account was settled. **Id**. at 29-30; Zevulun Dep. at 76.

After buying the diamond from Zevulun, Sianes testified that he sent it to S.B. in New York, and Siyance testified that he received it there. Tr. at 32, 90-91. Meyer Sommer ("Sommer"), a diamond broker who had worked with S.B. for many years, Sommer Dep. at 13, took the diamond and submitted it to GIA for grading. Tr. at 91, 92; Sommer Dep. at 23-24. S.B. documented this with a consignment memo. Tr. at 92, 134; Zarian Exh. 12. After the diamond was submitted to GIA, S.B. was informed that the diamond matched the description of a stone that had been stolen from Zarian. Tr. at 93. GIA notified S.B. that it was holding the stone

until its ownership could be determined.  **Id**.

### III. DISCUSSION

**A.     Choice of Law: New York versus Israel**

In a diversity action, a federal court applies the choice of law rules of the state in which it sits, in this case, New York.  *See* **Klaxon Co. v. Stentor Elec. Mfg. Co.**, 313 U.S. 487, 496 (1941); **Spanierman Gallery v. Merritt**, 2004 WL 1781006, at *3 (S.D.N.Y. Aug. 10, 2004). New York choice of law mandates that questions regarding the "validity of a transfer of personal property [be] governed by the law where the property is located at the time of the transfer." **Wertheimer v. Cirker's Hayes Storage Warehouse, Inc.**, 2001 WL 1657237 (N.Y. Sup. Sept. 28, 2001) (replevin action); *see* **Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.**, 1999 WL 673347, at *4 (S.D.N.Y. Aug. 30, 1999).  Furthermore, where the theft occurs is irrelevant; what is important is where the sale or transfer of the stolen property took place.  *See* **Kunstsammlungen Zu Weimar v. Elicofon**, 536 F. Supp. 829, 846 (E.D.N.Y. 1981). Therefore, where the sale of the diamond occurred is material in this case because it will determine which law on purchases applies.  As noted, while Zarian claims the transfer occurred in New York, S.B. claims it occurred in Israel.

Under New York Law, a purchaser of personal property cannot acquire good title from a seller who stole the property.  *See* **Kunstsammlungen**, 536 F. Supp. at 846; **Candela v. Port Motors Inc.**, 617 N.Y.S.2d 49, 50 (App. Div. 2d Dep't 1994) (finding that purchasing a car from a successor in interest to a car thief results in purchaser receiving void title).  Because the Court has already determined that the diamond was stolen from Zarian in Dubai, if the sale or transfer took place in New York, the diamond is rightfully Zarian's.

4

In Israel, the "basic rule . . . is that a person cannot transfer to another more rights than he himself possesses." Eyal Zamir, *Market Overt in the Sale of Goods: Israeli Law in a Comparative Perspective*, 24 ISRAELI LAW REV. 83, 97 (1990) ("Zamir").  Section 34 of Israeli Sales Law sets forth a significant exception to this principle known as "market overt," Zamir at 98, or "market remedy."  **Shlomo Shetah v. Leon Bilder**, District Court of Tel Aviv, C.A. 582/89 (1991), Post-Trial Memorandum of S.B. Diamond ("S.B. Memo."), Exh. A, English translation ("**Shetah**") at 1.  Section 34 states:

> Where any movable property is sold by a person who carries on the sale of property of the kind of the thing sold, and the sale is made in the ordinary course of his business, ownership passes to the buyer free of every charge, attachment or other right in the thing sold even if the seller is not the owner thereof or is not entitled to transfer it as aforesaid, provided that the buyer buys and takes possession of it in good faith.

Zamir at 98; *see* **Shetah** at 3.

It is helpful to compare this provision to those found in other legal systems.  As Zamir has written, there are three possible solutions to the problem of stolen goods and subsequent transfer of ownership: "preference to the original owner, preference to the purchaser, or some intermediate solution."  Zamir at 88-89.  Roman law and the law of ancient Greece both adhered to the basic principle that one cannot transfer rights one does not possess.  **Id**. at 89.  Now, "there are almost no legal systems which do not recognize exceptions to [that] rule . . . . Yet, very few legal systems have totally abandoned [it] and in place adopted a general preference for the *bona fide* purchaser."  **Id**.  The Italian Civil Code is "the most striking expression" of the preference for the purchaser, requiring solely good faith and transfer of possession in order to obtain title.  **Id**.  In contrast, French and German law, as well as the United States' Uniform Commercial

5

Code § 2-403, analyze both the circumstances under which the property at issue departed from the original owner and the circumstances of the new possessor's purchase. **Id**. at 93.

Like that of Italy, Israeli law prefers the *bona fide* purchaser, but Israel is not as extreme in that respect. Section 34 "focuses on the purchaser, and the circumstances in which he purchased the goods. The rule entirely disregards the manner in which the property left the prior rights-owner's possession." **Id**. at 98. The goal is to "encourag[e] the security of purchasers in the commercial and consumer areas." **Id**. at 94. The law imposes six requirements. The first five are objective tests: 1) a sale or contract must be made; 2) the property at issue must be "movable property"; 3) the seller must deal with the sale of property of the kind of item sold; 4) the sale must be made in the ordinary course of the seller's business; and 5) the buyer must take possession of the goods. **Id**. at 99. The sixth requirement is a subjective test: the buyer must have acted in good faith. **Id**. The result of this combination of objective and subjective factors is that "an honest mistake on the part of the buyer as to the existence of one or more of the first five conditions, even if the mistake is reasonable, will be of no benefit to him if one or more of them is not in fact met. On the other hand, [because] the sixth condition is entirely subjective . . . even if the mistake as to the seller's rights was not reasonable, this will not detract from the required good faith." **Id**.

If S.B. successfully demonstrates that the sale of the diamond took place in Israel, then S.B. has the additional burden of demonstrating that the sale meets the requirements of section 34. Only three of these conditions are in dispute: whether the man who sold the diamond to S.B. sells the kind of goods at issue here, whether the sale was made in the ordinary course of that seller's business, and whether S.B. acted in good faith. *See* Post-Trial Brief in Support of

Zarian's Claim to the 11.57 Carat Diamond ("Zarian Br.") at 10. If S.B. meets its burden, then S.B. takes title to the diamond despite the Court's earlier finding that the diamond was stolen from Zarian.

**B.     Where the Sale Took Place**

It is important to note that no admissible documentary evidence was presented to establish S.B.'s purchase of the diamond in Israel. Instead, S.B. relied entirely on oral testimony. Sianes testified at trial that he bought the diamond from Zevulun at the Exchange in Israel. Tr. at 27-30. Zevulun confirmed this in his deposition testimony. Zevulun Dep. at 65-68. Both witnesses were consistent in their description of most of the circumstances of the sale. The witnesses explained that the way in which the diamond was purchased involved the use of a *petek*, a note which is routinely destroyed after payment is made. Zevulun Dep. at 57-60, 76; Tr. at 20-21, 29-30 (Sianes), 89, 109 (Siyance). This explanation for the lack of initial documentation was credible, although the complete lack of any other documentary evidence from either of the two parties' finances raises serious questions.

Zarian has argued that, even if Sianes bought the diamond from Zevulun in Israel, the evidence does not support S.B.'s contention that Sianes is the Israeli buyer for S.B. Zarian Br. at 16-18. If, for example, Sianes is not a member of the family business and bought the diamond and then *sold* it to S.B., the relevant transfer would then have taken place in New York and New York law would apply, under which Zarian would have rights to the diamond.

However, while there was minimal documentary evidence outlining the corporate structure of S.B., the witnesses were consistent and credible in their description of the arrangement of the Siyance family diamond business. It is clear that Sianes serves as the buyer

7

for the family business, which includes S.B., on the Israeli Exchange. Tr. at 17, 26, 32, 51-52, 83; Zevulun Dep. at 71, 89; Bassalion Dep. at 17. It is also clear that he is a member of the family business, along with the other brothers, although the testimony about his exact percentage of ownership and title at the time of the sale in question was at best imprecise. Tr. at 36 (Sianes: "Formally I am not [a partner in S.B."]), 38 (Sianes: "The whole thing is a family business . . . I don't remember at that particular time how much percentage it was but as of today 40 percent is mine and 60 percent is a foreign company and I don't remember its name [but] all the brothers are part owners."), and 98 ("Q: Again, your answer to the question is, even though this document says you have 99 shares of David Gems, at the time of your deposition you did not know anything about this document, correct? A[Siyance]: Perhaps."); S.B. Exh. 22.

The organization of the family business finances was also quite fuzzy. Tr. at 33 ("Q: You didn't contribute any money to the establishment of SB Diamond Corp., correct? A[Sianes]: No, I didn't, but all of it is the family money. . . . Q: And you've never loaned any of your own money to SB Diamond Corp., correct? A: No. . . . Q: And S.B. Diamond Corp. has never made you a salary, correct? A: Correct. Q: And SB Diamond Corp. has never given you money on a regular basis, correct? A: Correct."), 45 ("Q: And . . . as of October 15, 2001 there was not one bank account with your entire family on it, correct? A[Sianes]: As far as I know, no."), 61 (Sianes: "I don't receive money into the account specifically for a certain thing. There is a family fund – family account . . . for David Gems out of which we take money to pay our debts."). The Court finds that these ambiguities do not contradict the specific premise, that is, the brothers conducted a family business, and do not detract from the consistency of the testimony in regard to Sianes's role in S.B.

8

Zarian has also argued that a transfer of possession took place in New York when the diamond was taken from the S.B. office by Sommer. Tr. at 91-92, 136-37. However, the testimony about the consignment to Sommer, a broker with a long-standing relationship with S.B., was consistent among the various witnesses. **Id**. at 92-93 (Siyance); Sommer Dep. at 13-16, 22-25. The oral testimony was also supported by a copy of the consignment memorandum. *See* Zarian Exh. 12. Consignment is inconsistent with a transfer of ownership, *see* Tr. at 137, and therefore does not establish a transfer in New York.

While the oral testimony was credible that Sianes bought the diamond in Israel for S.B., the complete lack of documentary evidence of the purchase is disturbing. In any case, as outlined below, the Court finds that, even if S.B. did buy the diamond in Israel, S.B. has not met its burden to demonstrate that the purchase meets the conditions of the Israeli Sales Law to obtain title to stolen goods.

C.     **Whether S.B. Obtained Good Title Under Israeli Law**

In addition to demonstrating the purchase of the diamond in Israel, S.B. must prove that the purchase meets the three conditions of section 34 of the Israeli Sales Law which are in dispute. Again, S.B.'s case rested almost entirely on oral testimony. Here the lack of documentation precludes S.B. from gaining title to the diamond. Even given the confusion often caused by translation, the testimony is inconclusive on many important points, and there are no documents to clarify those details. Furthermore, in some areas, either there is no explanation for the lack of documentation or the explanations are inconsistent. As a result, S.B. has not met the burden of proof required to obtain title to the diamond.

### 1. Seller Deals with the Kind of Property of the Kind of Item Sold

"Only a purchase from a person who deals with the sale of property of the kind of the item sold may acquire good title in accordance with section 34. . . . [It] need not be his only occupation, and it would seem that it need not even be his primary occupation. . . . The degree of identity or similarity between the item sold and the goods that are ordinarily sold by the seller may vary according to the situation. The word 'kind' does enable flexibility in the application of the rule."

Zamir at 104-06.

The evidence was clear that Zevulun, the seller, was a long-time member of the Israeli Precious Stones and Diamond Exchange, and had participated in various aspects of the diamond industry. Zevulun Dep. at 20; Tr. at 24, 26. These facts weigh in S.B.'s favor. However, a key point was unclear in the testimony--whether Zevulun had bought and sold diamonds of the size of the one at issue here before the relevant time period--and no documentary evidence was presented to clarify. Zevulun Dep. at 41-43. While Zevulun stated clearly that since that time he has sold even bigger diamonds to S.B., he said "it could be" that he had bought stones of that size before October 2001, but he did not remember. **Id**. at 43.[1]

Uncertain statements such as "it could be," paired with "I don't remember" cannot, standing alone, meet S.B.'s burden. In **Shetah**, an Israeli appellate opinion involving similar facts as those here, the court found in favor of the purchaser on this factor because the seller was the owner of a diamond polishing plant whose partners "worked as diamond traders" and whose "business also included large diamonds such as the disputed diamonds." **Shetah** at 3. The court there was able to conclusively state what the Court here cannot - that the seller clearly had

---

[1] It also became clear at trial that S.B. and Sianes had not regularly dealt in larger diamonds before October 2001. Tr. at 50-51, 55, 81, 113. However, "[w]hether or not the *purchaser* carries on the buying or selling of property of the kind sold is (in th[e] context [of this factor]) of no significance." Zamir at 106 (emphasis added). Instead, this fact becomes relevant when the Court evaluates whether S.B. has proven its good faith.

previously bought and sold the kind of diamond in dispute. While that inference could perhaps be made, an inference alone will not suffice, no matter how "flexible" the rule.

2. **Sale Made in the Ordinary Course of the Seller's Business**

> The ordinary course of business test is not a technical test of the place of conclusion of the contract or the place for its execution, or of the time of conclusion or execution. It is a complex test which relates to all the surrounding circumstances of the sale. . . . In each case one must examine the ordinary features of the seller's trade and whether or not they are present in the particular transaction . . .

Zamir at 108.

As in the prior factor, some of the aspects of the testimony weigh in S.B.'s favor when looking at all the circumstances of the sale. The sale took place in the Exchange, where Zevulun routinely conducted his business. Sianes inspected the diamond visually in a manner in which the witnesses testified was the usual practice. Tr. at 28-29; Zevulun Dep. at 67. The witnesses credibly explained the usual practice of exchanging a diamond for a *petek*, settling accounts later and then destroying the *petek*. Zevulun Dep. at 57-60, 76; Tr. at 20-21, 29-30 (Sianes), 89, 109 (Siyance). This same practice was apparently followed here. Tr. at 29-30 (Sianes). However, while this explains why there is no initial documentation of the sale, neither Zevulun or Sianes could remember exactly how the payment was arranged between them, which led to the destruction of the *petek*. Zevulun indicated they may have off-set a debt they had already, Zevulun Dep. at 72, but Sianes did not know. Tr. at 57. Sianes admitted he had no documents to demonstrate that he had paid Zevulun for the diamond. **Id**. at 59. Zevulun initially refused to answer questions about his usual practice of documentation when exchanging stones for money, Zevulun Dep. at 43-44, but then eventually explained that he writes things down, but not always,

11

and that his finances are tallied by his accountant. **Id**. Neither man explained why no documents existed within their own financial accounts to show this particular account had been settled.

In addition to the lack of either clear oral testimony or documentary evidence as to the financial components of the sale, other aspects of the sale appeared questionable. However, for each of those facts, the witnesses testified that such is the 'ordinary course' of business on the exchange. For example, the diamond was sold without any documents certifying its qualities. Sianes testified he asked Zevulun for such documents, but Zevulun had none. Tr. at 54. Zevulun testified this was not unusual. Zevulun Dep. at 84, 105, 108. In addition, Sianes did not ask Zevulun about the background of the stone; both men testified that it is the usual practice not to inquire. Zevulun Dep. at 53; Tr. at 31, 53. No matter how credible these witnesses may appear on these points, the Court simply must conclude that nothing but self-serving statements supports their claim that those aspects of the transaction are routine.

In **Shetah**, the court found that the sale of the diamond in question took place in the ordinary course of business. The seller, a long-time participant in the diamond industry, was not a member of the exchange and the transaction took place in the "square next to the hall of the exchange." **Shetah** at 4. The court found that traders who were not members of the exchange "normally" made their transactions there. **Id**. The payment had been made by off-setting a debt, which the court found adequately "in the normal course of the [seller's] business." **Id**. While S.B. has argued that the circumstances in **Shetah** appear more questionable than the sale at issue here, the material difference is a matter of proof. In laying out the facts of that case, the court cited four exhibits documenting various aspects of the events the purchaser claimed had taken place. **Id**. at 1-3. While the content of each document is not entirely clear from the text of the

12

opinion, one thing is clear: the court was not forced to rely entirely on the word of those involved when it concluded that the sale took place in the ordinary course of business. There, documentary evidence was available to establish certain facts, particularly the financial aspects of the dispute. Here, not only are there no documents to support the claims of the men who made the sale, no documents were provided to assist the Court in understanding the usual practices. "Deviations from the norm at the execution stage of the contract may detract from the good faith of the buyer, but will not in themselves negate the existence of [a sale made in the ordinary course of business.]" Zamir at 108. Here, however, the "norm" was not established by any objective evidence. Instead, the Court was left to assess the witnesses' statements solely in light of their own characterizations of the ordinary course. This was simply not enough to carry S.B.'s burden.

### 3. Buyer's Good Faith

The good faith factor is the sole subjective component of the section 34 analysis. Zamir at 111. "The buyer is in good faith if he does not know that the seller is not the owner of the item sold, or that he is not entitled to transfer it, or that he is not entitled to transfer it free of third party rights. The purchaser is in good faith when he assumes that the seller is entitled to transfer the thing sold free of every charge, attachment, or other right." Zamir at 110. In **Shetah**, the court explained the principle behind the good faith factor:

> [I]ts purpose [is] to bring about free and continuous trade in movable property in places of business intended for such without the need for any investigations and examinations whatever, unless the circumstances of the case are likely to arouse suspicion of the right or the power of the seller to carry out the transaction and the buyer closes his eyes and purposely refrains from delving into the suspicion and clarifying it.

13

**Shetah** at 4 (*quoting* **Zehava Rosentreich v. Israel Auto. Co.**, C.A. 716/72). Good faith in this context does not require a certain amount of investigation on the part of the buyer, and in fact, as Zamir points out, "The rule is that negligence and good faith can very well exist together." Zamir at 111 (internal quotations omitted). Unless the circumstances are particularly suspicious, "negligence alone in investigating the possibility of the existence of a defect in the seller's ownership, when the circumstances do not arouse such a suspicion, does not negate good faith" **Shetah** at 5 (*quoting* **Shimon Yosef v. Israel Auto. Co.**, C.A. 81/73). The fact that the object at issue is expensive, standing alone, does not "arouse" such suspicion. **Id**. Furthermore, as long as there is a credible explanation, it appears that otherwise suspicious circumstances do not require the good faith buyer to investigate. For example, in **Shetah**, the fact that the diamond in dispute had been polished into a different form was not sufficient to raise suspicion because one of the parties had commented that it might need polishing. **Id**. On the other hand, if suspicious circumstances do exist, than a failure to investigate, or "shutting one's eyes[,] is equivalent to actual knowledge." Zamir at 112.

Zamir lists five factors for courts to consider in the good faith analysis. **Id**. at 115. First, the court may assess "the price and the manner of payment." **Id**. For example, if the price is lower than usual, the origin of the product may be "dubious." **Id**. Second, the court may consider the "character of the seller and the nature of his business." **Id**. If the seller has an established business, is respected and well-known, then it "may be assumed that the buyer will rely in good faith on the integrity of his purchase." **Id**. Third, the "circumstances of the transaction" are to be assessed. **Id**. at 116. If the sale is of a public nature and if there is hard bargaining, those facts would weigh towards a finding of good faith. **Id**. On the other hand, if

the seller is too eager, this could demonstrate bad faith. **Id**. Fourth, the court is to examine the buyer's behavior. **Id**. The "recklessness of the buyer does not in itself necessarily indicate lack of good faith . . . [However,] 'shutting one's eyes,' . . . is incompatible with good faith." **Id**. Finally, "the features of the item sold" can be a part of the analysis. **Id**. None of the factors are dispositive and the "overall facts" must be examined. **Id**. Obviously, this means that proof of the buyer's good faith is key. Zamir emphasizes that "[w]hile the test for the existence of good faith is totally subjective, usually there is no alternative but to determine it and prove it by way of *external evidence*." **Id**. at 115 (emphasis added).

In **Shetah**, the court listed the facts which weighed towards a finding of good faith, among them, that the stone was purchased at full price and that after buying the diamond, the purchaser gave it to a broker and then presented it for sale to the person from whom it had been stolen. **Shetah** at 6. Here, a number of similar factors favor S.B. Sianes paid what appears to be close to the market price of the diamond, and he bought it at the Exchange. Siyance then gave it to a broker, who submitted it to the GIA for grading. However, the dearth of external evidence for the vast majority of these and other pertinent details and the absence of a consistent credible explanation for this lack of documentation together preclude S.B. from demonstrating good faith. Here, the Court will focus on three of the factors for the good faith analysis: the manner of payment, the circumstances of the transaction, and the buyer's behavior.

The manner of payment and the circumstances of the transaction have already been discussed in the context of the other factors. As explained above, while the witnesses could credibly explain how the initial transaction took place and why the key document, the *petek*, had been destroyed, no one recounted any details about how money actually changed hands and no

15

one could provide any documentary evidence of the sale from either the buyer or seller's finances to clarify. Furthermore, while the witnesses testified that it was either common or usual to sell diamonds without any documents to certify their qualities or their ownership, or to ask any questions about a diamond's origin, as was the case here, no objective evidence of this "ordinary course" was presented.

The good faith test is a subjective one, and Sianes and Siyance both testified that they believed that everything was in order for the transaction. However, because absolutely no documentary evidence was presented to establish either the price and manner of payment or the circumstances of the sale, the Court finds that as to these factors, they have not provided sufficient evidence to support their expressions of good faith.

As Zamir noted, the buyer's behavior is another factor in the good faith analysis. The behavior of S.B., particularly with respect to the diamond's journey to the New York office, only raises further questions about S.B.'s good faith. First, S.B. presented no documents to verify the diamond's transport by courier, entry through U.S. Customs, or arrival in their New York office. In addition, none of the witnesses could remember any of those details. Tr. at 66 (Sianes); Tr. at 91, 117 (Siyance); Bassilion Dep. at 80. Sianes did not remember what courier he had used. Tr. at 66. Siyance did not remember who had handed him the stone when it allegedly arrived in his office. **Id**. at 143. Sianes was also unsure about whether he had sent the diamond with any sort of insurance. **Id**. at 67. S.B. had no notes as to when the account on this diamond was concluded. **Id**. at 71, 137.

Even more critical, no one could credibly explain why no documents would exist. In fact, Bassilion testified that had S.B. used the importer it usually did, some records should have been

16

available. Bassalion Dep. at 28. Bassalion also said that S.B. sometimes did not have any records on a diamond until after it was graded by GIA. **Id**. at 13-14. Bassalion testified that while S.B. sometimes had record of a wire transfer for payment for a diamond, in this case, S.B. did not have one, and he did not remember filling one out. **Id**. at 73-74. The Court would readily accept the lack of a record of a wire transfer if any witness had been able to remember the manner of payment. But none could.

S.B. also lacked any internal documentation on the diamond's arrival. In fact, S.B.'s sole documentation of the diamond began when Sommer took it on consignment and submitted it to GIA under Gross's name. *See* Zarian Exh. 12. Sianes and Siyance both testified that Sianes usually sent stones to S.B. with an invoice. Tr. at 50, 110. Invoices were usually maintained. **Id**. at 112. However, no contemporaneous invoice was available here.[2] **Id**. S.B. attempted to explain this by mentioning that, while each smaller stone was recorded, the company did not usually record larger stones since they were easier to remember. **Id**. at 114. And in fact, although the testimony was somewhat unclear, it seems that in October 2001, the size of diamond like the one at issue here had not yet been the usual fare for S.B. Bassalion Dep. at 25, 59, 64; Tr. at 50-51, 54-55 (Sianes), 113 (Siyance). Apparently, S.B. began to deal in larger diamonds in 2000 because the manufacturing of smaller stones shifted to China and such stones were more difficult to obtain. Tr. at 81.

The testimony that, at times, S.B. had no documents on a diamond until it was graded,

---

[2]In discovery, S.B. produced an English-language invoice from Zevulun, dated October 15, 2001, and stating that the diamond had been sold to S.B., listing its New York office. In depositions, Zevulun and Sianes reported that the invoice was not made contemporaneously, but was created later in order to document the sale once GIA notified S.B. it was holding the diamond. *See, e.g.,* Zevulun Dep. at 77-78. After Zarian moved to preclude the use of the invoice at trial on hearsay grounds, S.B. withdrew the back-dated invoice as an exhibit.

and the testimony that in October 2001 S.B. had just begun to transact in larger diamonds like the one at issue could perhaps explain the marked lack of documentation presented here. However, in the face of testimony that in the case of other diamonds, documentary evidence would normally be available, S.B.'s witnesses' suppositions on this point are insufficient. No matter how broad an exception section 34 intends to carve into the rule that one cannot transfer more rights than one possesses, S.B. cannot meet its burden with such vague explanations. Even more detailed oral testimony providing details specific to this transaction could perhaps suffice. However, the testimony was inconclusive on many of the most critical points, and there was absolutely no documentation to fill the gaps. S.B. has not established that its purchase of the diamond in Israel was from a seller who dealt with the kind of property at issue, was in the ordinary course of business, or was in good faith.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that, even if S.B. bought the diamond in Israel, S.B. has not met its burden to show that the purchase fulfills the requirements of the Israeli Sales Law for the transfer of title of stolen goods. Judgment is therefore entered for Zarian.

**SO ORDERED this 4th day of August 2006**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**